## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| Aubrey P. Nathan, Jr., | ) | |
| | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. _____ |
| | ) | |
| Arcus Hunting, LLC, | ) | |
| | ) | |
| Serve at: | ) | |
| CSC | ) | |
| 221 Bolivar Street | ) | |
| Jefferson City, MO 65101 | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## COMPLAINT

COMES NOW Plaintiff, Aubrey P. Nathan, Jr. ("Nathan" or "Plaintiff"), and for his

Complaint against Defendant, Arcus Hunting, LLC ("Arcus" or "Defendant"), states and alleges as

follows:

## PARTIES

1.      Plaintiff Nathan is an individual residing in Centerpoint, Texas.  Nathan is the

founder of Tink's® branded hunting and hunting-related products, which has been a leader in the

industry for over forty (40) years.

2.      Defendant Arcus is a Delaware limited liability company with its principal place of

business located in the State of Georgia, who is not registered to do business in the State of Texas.

Defendant Arcus manufactures and sells various hunting and hunting-related products, including

products sold under the brand Dead Down Wind™ and products sold under the brand Tink's®.  Arcus sells its products nationwide, including in the State of Texas.  Arcus can be issued with service of process through the Secretary of State, who can forward process to the Defendant's principal office at 1416 Lake Forest Drive, Unit A, Covington, GA 30014. Plaintiff hereby requests issuance of a summons and Complaint.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over of this action pursuant to 28 U.S.C. § 1332 as the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

4.      This Court has personal jurisdiction over the Defendant based upon its presence within this judicial district and its transaction of business within this district.  Specifically, Arcus is required by the license agreement at issue in this lawsuit to use commercial reasonableness in marketing and selling Tink's branded products in order to maximize the sales of those product and to maximize the resulting royalties to Plaintiff, including within the State of Texas.  Defendant is therefore subject to the jurisdiction of this Court pursuant to Tex. Civ. Practice & Remedies Code § 17.042, and to service of process issued from Texas pursuant to Tex. Civ. Practice & Remedies Code §17.045(a).

5.      Venue in this Court is proper under 28 U.S.C. § 1391.

## FACTUAL ALLEGATIONS OF THE COMPLAINT

6.      Nathan first began manufacturing and selling Tink's® branded products for use in the hunting industry in the 1970s.  Over time, the Tink's® name became famous in the hunting industry for providing both attractants and scent masking products ("Tink's® Products").  In the 1980s, Nathan began licensing trademarks related to the Tink's® Products to third parties to manufacture and sell Tink's® Products in exchange for payment of a royalty to Nathan.

2

7.      Nathan entered into an Amended and Restated License and Royalty Agreement with PAT Acquisition, LLC dated February 5, 2004 (the "License Agreement").  A true and accurate copy of the License Agreement is attached hereto as Exhibit A.

8.      Upon information and belief, on or about January 7, 2015, Defendant Arcus acquired PAT Acquisition, LLC without Nathan's prior knowledge.

9.      Upon information and belief, Defendant Arcus is owned by Bregal Partners, a New York-based private equity company that formed Arcus in mid-November 2014 – less than two months before closing on the acquisition of PAT Acquisition, LLC – with the acquisition of Dead Down Wind™.

10.     Upon information and belief, PAT Acquisition LLC assigned the License Agreement to Arcus, and Arcus became the successor-in-interest to the License Agreement.

11.     As the successor-in-interest to PAT Acquisition LLC, Arcus is a party to the License Agreement with Nathan.

12.     Pursuant to the License Agreement, Arcus received a worldwide license to use the Trademarks set forth in Reg. Nos. 1,207,374 and 1,456,049 and in Ser. Nos. 76/417,360, 76/417,361 and 76/417,362 "as such relate to hunting and hunting related products" (the "Marks"). (Ex. A, ¶ 1(a)).

13.     There is substantial value in the goodwill, reputation, and public recognition associated with the Marks.

14.     Pursuant to the License Agreement, Arcus agreed to pay Nathan during his life and to Nathan's beneficiary for eight years following Nathan's death a royalty "with respect to the goods set forth in Reg. Nos. 1,207,374 and 1,456,049 and Ser. Nos. 76/417,360, 76/417,361 and 76/417,362 as such relate to hunting and hunting related products sold by Licensee during the Term,

3

and other products that are now or in the future sold by Licensee under the Marks pursuant to and as authorized by the terms hereof (the "Licensed Products")."  Ex. A, ¶ 10.

15.     The Licensed Products include, *inter alia*, deer scents used as hunting lures; insect repellant for personal use; scents used to cover human odor; odor and scent eliminators; laundry soap; hair and body soap; shampoo; gun and bow oil; deodorants; scented dryer sheets; Wind™ direction indicators in powdered form; scent dispensers; rope and cordage; clothing and hats; hunting decoys; hunting blinds; scent suppression clothing; tree stands for hunting; clothing; camouflage clothing; fabric; animal calls; bird calls; foods; sauces; marinades; printed publications; pre-recorded videotapes; compact discs; DVDs and cassettes; and feminine hygiene products.

16.     For decades, Tink's® branded products have included products in two broad categories: a) those products that contain an active scent, such as attractants (hereafter, "Attractants"); and b) those products that are designed to eliminate, cover or mask scent (hereafter, "Masking Agents").

17.     Masking Agents include products such as scents used to cover human odor, odor and scent eliminators, laundry soap, hair and body soap, shampoo, deodorants, scented dryer sheets, and scent suppression clothing.

18.     Arcus manufactures and sells various Masking Agents under the brand Dead Down Wind™ that compete directly with Tink's® Masking Agents.

19.     Upon information and belief, the vast majority, if not all, Dead Down Wind™ products are Masking Agents.

20.     As of January 2015, when Arcus acquired PAT Acquisition, LLC, PAT Acquisition, LLC was actively manufacturing and selling Tink's® branded Attractants and Masking Agents, and Nathan was receiving a Royalty on the sale of all such products pursuant to the License Agreement.

21.     As of January 2015, when Arcus acquired PAT Acquisition, LLC, the Tink's® branded Attractants and Masking Agents were successful products with significant sales in the hunting industry, and Nathan was receiving a steady stream of Royalties on all such Licensed Products pursuant to the License Agreement.

22.     Pursuant to the License Agreement, Arcus was required to "utilize commercial reasonableness with respect to the manufacture, distribution, marketing and sale of all 'Licensed Products', as defined in Paragraph 10 [of the License Agreement], **in order to maximize the sales of the Licensed Products and the amount of the 'Royalty'**, as defined in Paragraph 10 [of the License Agreement], payable to [Nathan]."  Ex. A, ¶ 5(b) (emphasis added).

23.     Upon acquiring PAT Acquisition, LLC, Arcus began manufacturing, distributing, marketing and selling Dead Down Wind™ branded Masking Agents in direct competition with Tink's® branded Masking Agents.

24.     Upon information and belief, Arcus does not pay a royalty on the sale of Dead Down Wind™ branded Masking Agents that compete directly with Tink's® branded Masking Agents.

25.     Arcus is required to pay a royalty to Nathan on the sales of all Tink's® Licensed Products, including Masking Agents.

26.     Over time, Arcus began marketing Tink's® branded Attractants and Masking Agents and Dead Down Wind™ Masking Agents side-by-side at trade shows, focusing its efforts on selling Tink's® branded Attractants and Dead Down Wind™ branded Masking Agents.

27.     Over several years, Arcus successfully increased the sales of Dead Down Wind™ branded Masking Agents to the detriment of the sales of Tink's® branded Masking Agents, in contravention of Arcus's obligation to use "commercial reasonableness in order to maximize the sales of the Licensed Products and the amount of the Royalty."

28.     Given that Arcus is obligated to maximize the Royalty paid to Nathan, its decision to actively market and sell products in direct competition with Tinks® Licensed Products falls woefully short of the efforts a reasonable business entity would have made under similar circumstances.

29.     Ultimately, Arcus entirely eliminated the Tink's® branded Masking Agents and offered for sale only its competing in-house Dead Down Wind™ branded Masking Agents.

30.     As a result of replacing Tink's® branded Masking Agents with Dead Down Wind™ branded Masking Agents, Arcus avoided paying royalties to Nathan, and the royalty payments Nathan received under the License Agreement precipitously declined.

31.     Arcus knew or should have known that marketing and selling Dead Down Wind™ Masking Agents in direct competition with Tink's® Masking Agents would reduce the sale of Licensed Products and the Royalty payable to Nathan.

32.     The License Agreement is governed by and is to be construed and enforced in accordance with the laws of the state of Georgia.  Ex. A, ¶ 14(d).

33.     Pursuant to the License Agreement, the prevailing party in this action shall be entitled to recover expenses, including reasonable attorneys' fees.  Ex. A, ¶ 14(j).

## COUNT I

### Breach of Contract

34.     Nathan repeats and realleges each of the allegations set forth in the paragraphs above as though fully restated herein.

35.     The License Agreement is a valid and binding contract supported by adequate consideration.

36.     Nathan has complied with his obligations under the License Agreement at all relevant times.

6

37.     Arcus breached the License Agreement by offering for sale and actively marketing Dead Down Wind™ branded Masking Agents in direct competition with Tink's® branded Masking Agents.  Specifically, Arcus violated its contractual obligation to use commercial reasonableness to maximize the sales of the Licensed Products and the amount of the Royalty.

38.     By offering Dead Down Wind™ branded Masking Agents  in direct competition with Tink's® branded Masking Agents, and focusing its efforts on the marketing and sale of Dead Down Wind™ branded Masking Agents to the detriment of Tink's® branded Masking Agents, Arcus did not "utilize commercial reasonableness with respect to the manufacture, distribution, marketing and sale of [Tink's® branded Masking Agents] in order to maximize the sales of the [Tink's® branded Masking Agents] and the amount of the 'Royalty'" Nathan received.

39.     By focusing its promotion, marketing and sales efforts on Dead Down Wind™ branded Masking Agents over Tink's® branded Masking Agents, Arcus was able to and did guide buyers to Dead Down Wind™ branded Masking Agents and away from Tink's® branded Masking Agents.

40.     After re-designing the Dead Down Wind™ packaging, and actively marketing Dead Down Wind™ branded Masking Agents in direct competition with Tink's® branded Masking Agents, Arcus completely eliminated its marketing and sales of all Tink's® branded Masking Agents, causing a foreseeable and significant reduction in Royalty payments to Nathan.

41.     Arcus diverted sales from Tink's® branded Masking Agents in order to sell Dead Down Wind™ branded Masking Agents, to the detriment of Nathan and in breach of the License Agreement.

42.     By its actions set forth herein, Arcus breached the License Agreement.

43.     As a result of Arcus' breach, Nathan has been and continues to be damaged in an amount to be determined at trial but which exceeds $75,000.

## COUNT II

### Breach of the Covenant of Good Faith and Fair Dealing

44.     Nathan repeats and realleges each of the allegations set forth in the paragraphs above as though fully restated herein.

45.     The License Agreement is a valid and binding contract supported by adequate consideration.

46.     An implied covenant of good faith and fair dealing exists in every contract, including the License Agreement.

47.     Nathan has complied with his obligations under the License Agreement at all times.

48.     By offering for sale and actively marketing Dead Down Wind™ branded Masking Agents in direct competition with Tink's® branded Masking Agents, Arcus breached the implied covenant of good faith and fair dealing.

49.     By promoting, marketing and selling Dead Down Wind™ branded Masking Agents in direct competition with Tink's® branded Masking Agents and actively guiding buyers to Dead Down Wind™ branded Masking Agents and away from Tink's® branded Masking Agents, Arcus breached the covenant of good faith and fair dealing in the License Agreement.

50.     Arcus breached the covenant of good faith and fair dealing by engaging in conduct that foreseeably resulted in eliminating Tink's® branded Masking Agents in favor of Dead Down Wind™ branded Masking Agents.

8

51.     As a result of Arcus' breach of the covenant of good faith and fair dealing, Nathan has been and continues to be damaged in an amount to be determined at trial but which exceeds $75,000.

## COUNT III

### Unfair Competition

52.     Nathan repeats and realleges each of the allegations set forth in the paragraphs above as though fully restated herein.

53.     Arcus' actions, as set forth herein, constitute unfair competition in violation of the common law of the state of Georgia.

WHEREFORE, Plaintiff Nathan prays that judgment be entered in its favor and against Defendant Arcus on all counts alleged herein in an amount to be proven at trial and which exceeds $75,000, for its attorneys' fees and costs incurred herein, and for such other and further relief as this Court deems just and proper.

## JURY DEMAND

**Plaintiff Nathan hereby demands a jury trial on all issues so triable in this action.**

Respectfully Submitted,

/s/ James M. Gary
James M. Gary        TX #24006722
Tera D. Johnson      TX #24097381
KUTAK ROCK LLP
124 West Capitol Avenue, Suite 2000
Little Rock, Arkansas 72201-3740
(501) 975-3000 (Telephone)
(501) 975-3001 (Facsimile)
James.Gary@KutakRock.com
ATTORNEYS FOR PLAINTIFF
AUBREY P. NATHAN, JR.

9

AND

Juliet A. Cox  *pro hac to be submitted*
KUTAK ROCK LLP
2300 Main, Suite 800
Kansas City, Missouri 64108
(816) 960-0090 (Telephone)
(816) 960-0041 (Facsimile)
Juliet.Cox@KutakRock.com
Bryan.Stanley@KutakRock.com

## AMENDED AND RESTATED LICENSE AND ROYALTY AGREEMENT

THIS AMENDED AND RESTATED LICENSE AND ROYALTY AGREEMENT ("Agreement") is made this 5th day of February 2004, by and between Aubrey P. Nathan, Jr. ("Licensor"), and PAT Acquisition LLC, a Delaware limited liability company as successor to Wellington Leisure Products, Inc., a Delaware corporation ("Wellington") ("Licensee"). The "Effective Date" of this Agreement shall be as of the closing date of the proposed acquisition of certain assets as set forth in the Asset Purchase Agreement among Licensee, WLP Estate, Inc. and Safariland Hunting Corporation, dated January 29, 2004.

## RECITALS

Licensor is the owner of the following marks, as well as the applications and registrations thereof, which are hereinafter collectively referred to as the "Marks":

TINK'S (Stylized) , Reg. No. 1,207,374, for deer scent used a hunting lure based on use of the mark since at least as early as 1975;

TINK'S TOTAL PROTECTION, Reg. No. 1,456,049, for insect repellant for personal use based on use of the mark since at least as early as 1984;

TINK'S, Ser. No. 76/417,360, for scents used as hunting lures; scents used to cover human odor; odor and scent eliminators; laundry soap; hair and body soap; gun and bow oil; deodorants; scented dryer sheets; wind direction indicators in powdered form; scent dispensers; rope and cordage; clothing and hats based on use of the mark since at least as early as 1975;

TINK'S, Ser. No. 76/417,361, for hunting decoys; hunting blinds; scent suppression clothing; tree stands for hunting; clothing; camouflage clothing; fabric; animal calls; bird calls; foods; sauces; marinades; printed publications; pre-recorded videotapes; compact discs; DVD's and cassettes based on Licensor's bona fide intent to use the mark;

TINK'S TOTAL PROTECTION, Ser. No. 76/417,362, for insect repellants for personal use; odor and scent eliminators; laundry soap; hair and body soap; shampoo; feminine hygiene products based on Licensor's bona fide intent to use the mark.

As the owner of the Marks, Licensor has developed substantial goodwill, reputation and public recognition associated with and identified by the Marks.

It is the desire and intent of the parties hereto to amend and restate the existing Licensing Agreement dated June 13, 1989 as Amended September 15, 1999, in accordance with the terms set forth herein.

1

EXHIBIT

A

Wellington, as Licensee's predecessor to this Agreement, purchased certain assets (the "Safariland Assets") from Safariland Hunting Corporation, a Virginia corporation ("Safariland Hunting Corporation"), including, without limitation, a certain trademark "#69 Doe-In-Rut," as registered in the United States Patent and Trademark Office under Reg. No. 1,207,366. Safariland Hunting Corporation was and is the subject of a bankruptcy proceeding (case number 89-5-0557 (SD)) before the United States Bankruptcy Court for the District of Maryland (the "Bankruptcy Court"). Accordingly, the purchase of Safariland Assets by Wellington from Safariland Hunting Corporation was approved by the Bankruptcy Court.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree that the following terms shall supercede the prior understanding and from this date forward shall be the terms of this Agreement between the parties:

1.      (a) Subject to Paragraph 1(d) hereof, Licensor hereby grants to Licensee and Licensee hereby accepts during the "Term," as defined in Paragraph 9 hereof, an exclusive worldwide license (the "License") to use the Marks in connection with the manufacture, distribution, marketing and sale of the goods set forth in Reg. Nos. 1,207,374 and 1,456,049 and Ser. Nos. 76/417,360, 76/417,361 and 76/417,362 as such relate to hunting and hunting related products. Licensor agrees to meet and discuss with Licensee in good faith any additional products that Licensee desires to be covered by the License in order to permit Licensee to use the Marks in connection with the manufacture, distribution, marketing and sale of such additional products, upon such terms and subject to such conditions as both Licensor and Licensee may then mutually agree. Such approval by Licensor will not be unreasonably withheld.

(b) Licensee recognizes the great value of the goodwill, reputation and public recognition associated with each of the Marks, and acknowledges that the Marks, and all rights therein and goodwill pertaining thereto, are owned by and the property of Licensor. Licensee agrees that it will not, either during the Term, or at any time thereafter (except as contemplated by Paragraph 14(a) hereof), claim any right, title or interest in the Marks or assert that the Licensor's registration of the Marks is not valid. It is expressly Licensor's obligation at his own cost to protect, police and maintain the rights and goodwill attached to the Marks and Licensee agrees to cooperate in such efforts and not to cause such rights and goodwill to diminish.

(c) The License shall not include the right of Licensee to grant any sublicense or assign the License, or any rights in connection therewith, to any person without the consent of Licensor; except, however, Licensee may grant a sublicense or assign the License to a subsidiary whose outstanding capital stock or other equity interest is owned by Licensee upon the same terms and subject to the same conditions contained herein without the consent of Licensor, provided, that notice thereof, is first given to Licensor. Licensee shall, as a surety, irrevocably guaranty to Licensor, the obligations of such subsidiary to Licensor under such sublicense or assignment of the License with respect to the obligations of Licensee under this Agreement. Any such sublicense or assignment of the License shall not permit any further sublicense or

2

assignment of the License without the consent of Licensor, except with respect to the return of the License to Licensee or other subsidiary of Licensee as otherwise permitted by this Paragraph l(c).

      (d) Licensee acknowledges that pursuant to the initial License and Royalty Agreement, its predecessor, Wellington did grant, convey, assign and transfer to Licensor all of its right, title and interest in Reg. Nos. 1,207,374 and 1,456,049, if any, that it may have acquired from Safariland Hunting Corporation as a part of its purchase of the Safariland Assets referred to above or otherwise.

      2.    Licensee shall have the right to use the Marks in connection with: (a) the trademark "#69 Doe-In-Rut" and with the goods set forth in Reg. Nos. 1,207,374 and 1,456,049 and Ser. Nos. 76/417,360, 76/417,361 and 76/417,362 as such relate to hunting and hunting related products upon which the Marks have previously been used or where the Marks have been used in connection with the advertising thereof; and (b) other names or trademarks which Licensee may purchase, develop, or acquire and use in connection with the sale of the goods set forth in Reg. Nos. 1,207,374 and 1,456,049 and Ser. Nos. 76/417,360, 76/417,361 and 76/417,362 as such relate to hunting and hunting related products; provided, however, that Licensee shall obtain the consent of Licensor prior to its use of such other names or trademarks in connection with the Marks. Except with respect to the use of the Marks in connection with the trademark #69 Doe-In-Rut, or with respect to the goods set forth in Reg. Nos. 1,207,374 and 1,456,049 and Ser. Nos. 76/417,360, 76/417,361 and 76/417,362 as such relate to hunting and hunting related products, Licensor shall retain an absolute right to prohibit any of Licensee's intended or actual uses of the Marks, subject to the right of reasonableness incumbent under the provisions of Paragraph 1(a) hereof.

      3.  Licensor hereby represents and warrants to Licensee that:

      (a) he has the full power and authority to enter into this Agreement and, subject to the assignment of the existing License and Royalty Agreement to Licensee, to license the use of the Marks in connection with the manufacture, distribution, marketing and sale of the goods set forth in Reg. Nos. 1,207,374 and 1,456,049 and Ser. Nos. 76/417,360, 76/417,361 and 76/417,362 as such relate to hunting and hunting related products;

      (b) he has exclusive, ownership of each of the Marks and will protect and police same in order to protect and preserve the goodwill and rights connected therewith; and

      (c) none of the Marks is subject to or encumbered by any lien, pledge, mortgage or security interest.

      4.  Licensee hereby represents, warrants, and covenants to Licensor that:

      (a) Licensee is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware

      (b) the execution and delivery of and performance of Licensee's obligations under

this Agreement have been duly authorized by all proper and necessary corporate action, and this Agreement constitutes the valid and binding obligation of Licensee, enforceable in accordance with its terms, subject to the assignment of the existing License and Royalty Agreement to Licensee; and

(c) no approval or consent of any other person is required in connection with the execution and delivery of and performance of Licensee's obligations under this Agreement.

5.     (a) Licensee agrees that the quality and formulation of all products manufactured, distributed, marketed or sold by Licensee utilizing the Marks shall conform to standards set by and under the control of Licensor insofar as such standards are reasonably calculated and determined to assure that such products will be of a quality equal to the quality of the products using the Marks that were manufactured, distributed, marketed or sold by Licensor or Safariland prior to the date of this Agreement. Licensee agrees to cooperate with Licensor to facilitate control by Licensor of the quality of such products, including, without limitation, permitting Licensor upon his reasonable request, access to and inspection of the operations of Licensee, as such solely relate to the products licensed or to be licensed hereunder, and, supplying Licensor with such specimens and samples of products using the Marks as shall be reasonable for his individual use or for testing. In the event that Licensor suggests any problem or presents any question about the quality of such products utilizing the Marks, the parties shall confer within 30 days to resolve such problem or question to attempt to bring the said product(s) into compliance. Should the product(s) continue to be unsatisfactory to Licensor, a panel shall be formed within 15 days thereafter, composed of three industry experts. One expert shall be appointed by each party hereto and the third, shall be chosen by the two experts previously chosen by the parties hereto.   Such panel shall have 30 days to make a determination as to the quality or lack thereof of the product(s), and such determination shall be final, binding and conclusive as to the parties hereto. If for any reason the panel is not chosen within 30 days of a demand by Licensor and a determination announced by the panel within 90 days of the demand by Licensor, Licensor shall be entitled to institute an action to resolve the dispute in  the United States District Court or other appropriate forum and venue. The subsequent withdrawal of a product(s) from the market, based upon a timely determination of a poor quality by the panel, shall fully resolve any claim by Licensor of a breach of the quality control provisions of this Agreement with respect to any particular product.

(b) Licensee agrees that it will utilize commercial reasonableness with respect to the manufacture, distribution, marketing and sale of all "Licensed Products", as defined in Paragraph 10 hereof, in order to maximize the sales of the Licensed Products and the amount of the "Royalty", as defined in Paragraph 10 hereof, payable to Licensor hereunder.

6.     If Licensor has procured or obtained registration of the Marks in any country other than the United States, the terms hereof shall be equally effective with respect to each such registration. If registration of the Marks in any other country shall be determined by Licensee, in its sole discretion, to be advantageous, Licensor, upon the request of Licensee, shall pursue such registration, and execute such documents as may reasonably be required to effect and assist in that registration process.   Licensee agrees to pay all attorneys' fees and costs incurred by Licensor in obtaining such registration of the Marks in any other country or jurisdiction, where

Licensee has requested same.

7.    (a)   Licensee agrees to cooperate with Licensor in the protection of the Marks by promptly informing Licensor of all facts known to it concerning any encroachment, infringement or misuse of the Marks which comes to Licensee's attention. Thereupon, Licensor shall conduct his own investigation of such alleged encroachment, infringement or misuse and shall have the sole right, exercised in good faith, to take such action as he deems necessary to protect the Marks. Licensee shall have no right to prosecute, settle or compromise, or participate in any litigation with respect to any such claim; provided, however, that if Licensor does not initiate an action to prosecute any such claim within 120 days of learning of such alleged encroachment, infringement, or misuse, then Licensee may for itself and on behalf of Licensor initiate such action; and, provided further, that the settlement of any such action shall not prejudice or compromise the rights of Licensor hereunder and that, in the event that Licensee for itself and on behalf of Licensor is the prevailing party in such action, the costs and attorneys' fees incurred by Licensee in such action shall be paid by Licensor upon the entry of a final judgment to the extent that such costs and attorneys' fees were not recovered in such action. Licensee agrees to cooperate fully with Licensor in connection with the prosecution or settlement of any such claim which may be brought by Licensor, and to cooperate fully at all times for the purpose of securing, preserving, and protecting Licensor's rights in and to the Marks, provided, however, that any such settlement shall not prejudice or compromise the rights of Licensee hereunder.

(b)   In the event that Licensee receives notice of any claim, suit or demand against Licensor on account of any alleged encroachment, infringement, unfair competition, or similar matter relating to Licensee's use of the Marks, Licensee shall promptly notify Licensor of any such claim, suit or demand.  Thereupon, Licensor may take such action as he shall deem necessary to protect and defend the Marks.  Licensor shall have the right to defend, compromise or settle any such claim at the sole cost and expense of Licensor, using attorneys of his own choosing, and Licensee agrees to cooperate fully with Licensor in connection with the defense or settlement of any such claim. Licensor further agrees to hold Licensee harmless and to indemnify Licensee for any such action based on Licensee's lawful use of the Marks.

8.    (a)   Licensor agrees to take such action and to execute such documents as shall be required under applicable federal or state law to maintain, renew and keep current the Marks, their applications or their registrations.  Licensee  agrees to reimburse  Licensor for the reasonable attorneys' fees and costs incurred in connection with the renewal and maintenance of the Marks, their applications or their registrations.

(b)   At the request of Licensor or Licensee, the other party hereto, shall take such action, and execute and deliver to Licensor or Licensee, as the case may be, such further instruments of assignment or other documents, as may be reasonably necessary to carry out the intent of the agreements described herein and contemplated hereby.

9.    The term of this Agreement shall commence on the Effective Date and, unless

terminated earlier pursuant to the terms hereof, shall terminate at the end of the eighth year following the date of death of Licensor (the "Term").

10.     Licensee agrees to pay Licensor, during his life, and "Licensor's Beneficiary," as defined in Paragraph 10(b) hereof, for eight years following the date of Licensor's death, a royalty (the "Royalty") with respect to the goods set forth in Reg. Nos. 1,207,374 and 1,456,049 and Ser. Nos. 76/417,360, 76/417,361 and 76/417,362 as such relate to hunting and hunting related products sold by Licensee during the Term, and other products that are now or in the future sold by Licensee under the Marks pursuant to and as authorized by the terms hereof (the "Licensed Products"). The Licensed Products shall be considered sold when billed out.   For purposes of calculating the Royalty, the following definitions shall apply:

(a)     "Adjusted Gross Sales" means the aggregate gross sales from Licensed Products sold by Licensee at invoice prices, less any trade, quantity or promotional discounts, returns and "Uncollectible Amounts," as hereafter defined, plus any amounts collected, received, or deemed to be collectible, by Licensee that were previously determined to be "Uncollectible Amounts."

(b)     "Licensor's Beneficiary" means the person so designated in writing by Licensor to receive the Royalty hereunder (which designation must be received by Licensee prior the Licensor's death) or, in the absence of a written designation, Licensor's estate.

(c)     "Uncollectible Amounts" means that portion of any sale originated from the sale of Licensed Products that has, for a period of at least 150 days, been outstanding and unpaid, and which Licensee has reasonably determined, following its affirmative and diligent efforts to collect, is uncollectible.

(d)     "Year" means a 12-month period commencing on the first day of the Term or the anniversary of the first day of the Term, as the case may be.

11.     (a)     The Royalty shall be calculated on a monthly basis through the last day of each month (the "Calculation Date"), as follows:

In each Year during Licensor's life as well as the eight years following the date of Licensor's death, the Royalty, shall equal the aggregate of:

7% of Adjusted Gross Sales if the total purchase price paid to Licensee is equal to or less than $7,000,000;

6% of Adjusted Gross Sales if the total purchase price paid to Licensee is greater than $7,000,000 and equal to or less than $7,500,000; or

5% of Adjusted Gross Sales if the total purchase price paid to Licensee is greater than $7,500,000;

plus

6% of Adjusted Gross Sales greater than $14,000,000.

Notwithstanding the foregoing, Licensee shall make minimum annual royalty payments of $140,000 to Licensor for five years following the Effective Date of this Agreement so long as this Agreement is in effect.

In the event this Agreement is assigned to any third party (non affiliate) entity which may become a successor in interest by purchase of all stock, or substantially all of the assets of Licensee, or by merger, share exchange or other reorganization during the five years following the Effective Date of this Agreement and so long as this Agreement is in effect, Licensee shall pay Licensor a one time payment equal to two times the prior calendar year's Adjusted Gross Royalties promptly following the closing of such transaction.

In the event this Agreement is assigned to any third party (non affiliate) entity which may become a successor in interest by purchase of all stock, or substantially all of the assets of Licensee, or by merger, share exchange or other reorganization after the five years following the Effective Date of this Agreement and so long as this Agreement is in effect, Licensee shall pay Licensor a one time payment equal to the prior calendar year's Adjusted Gross Royalties promptly following the closing of such transaction.

(b)      The Royalty as calculated pursuant to Paragraph 11(a) hereof shall be paid by Licensee to Licensor or Licensor's Beneficiary, as the case may be, within 45 days following each Calculation Date.

(c)      Payments of the Royalty shall be made in U.S. Dollars in the United States. With respect to sales in countries other than the United States, the Royalty shall be calculated in U.S. Dollars at the official rate of exchange prevailing on the Calculation Date.

(d)      Within 30 days following each Calculation Date, Licensee shall provide Licensor with a report with respect to the month immediately preceding such Calculation Date, containing a detailed calculation of the amount of the Royalty due Licensor, a complete and accurate accounting of the number and description of Licensed Products sold, the amount of the Adjusted Gross Sales (and a schedule of how it was determined), the status of any Uncollectible Amounts, and any other material information relating to the Royalty and the Licensed Products. Licensee shall keep records in sufficient detail to permit the determination of the Royalty payable hereunder and, at the request of Licensor, shall permit an independent Certified Public Accountant, acceptable to both Licensor and Licensee, to examine, in confidence, during normal business hours, once during each calendar quarter, such records as may be necessary to verify or determine the amount of the Royalty paid or payable hereunder. If the amount of the Royalty is understated by five percent or more, Licensee agrees to pay the cost of the aforementioned audit; however, if the amount of the Royalty is understated by less than five percent, Licensor shall pay

the cost of the aforementioned audit.

(e)     Licensee shall submit to Licensor, no less frequently than once each year, copies of its published price lists in which Licensed Products are listed for sale, such price lists, catalogs and other sales materials are "Trade Secrets" of Licensee and are not to be divulged under any circumstances by Licensor to any third party.

12.     (a)     Each of the following events shall constitute an "Event of Default" by Licensee and a breach of this Agreement:

(i)     Licensee's failure to perform, comply with or abide by any representation, warranty, covenant or provision of this Agreement and the continuation of such failure for 30 days after written notice of such failure has been given to Licensee.

(ii)     The occurrence of any of the following events with respect to Licensee: (A) the making of an assignment for the benefit of creditors; (B) the appointment of a receiver or trustee for all or any substantial portion of its assets; and (C) the commencement of proceedings in bankruptcy or any other proceedings for arrangement or reorganization of its debts under any state or federal law, whether instituted by or against it (if proceedings are commenced against Licensee, Licensee shall have 30 days to obtain dismissal of the proceedings).

(iii)     Licensee shall attempt to sublicense, assign, transfer or otherwise permit the use of the Marks by others except as provided in Paragraphs 1(c) or 11(a) hereof, without the consent of Licensor.

(iv)     The vacation or abandonment of the Marks by Licensee. Subject to the other terms and obligations of Licensee hereunder, for purposes of this Paragraph 12(a)(iv), any decrease in Adjusted Gross Sales by 75% in a 12 month period over the immediately preceding 12 month period under a particular Mark or a termination of a product(s) with a consequential decrease in production and the Royalty shall be interpreted to be a vacation or abandonment of such specified   Mark by Licensee.   Notwithstanding the foregoing, this provision shall not result in vacation or abandonment in the event that during such year in question a withdrawal of products from the market occurred pursuant to Paragraph 5 hereof.

(b)     Upon the occurrence of an uncured Event of Default, Licensor shall have the right to terminate   the Agreement, effective   upon   Licensee's receipt of written notice thereof from Licensor.

13.     During Licensor's lifetime, Licensor agrees not to use the Marks or any marks similar thereto anywhere in the world in connection with the goods set forth in Reg. Nos. 1,207,374 and 1,456,049 and Ser. Nos. 76/417,360, 76/417,361 and 76/417,362 as such relate to hunting and hunting related products. Likewise, Licensor's Beneficiary agrees not use the Marks or any marks similar thereto anywhere in the world in connection with the goods set forth in Reg. Nos. 1,207,374 and 1,456,049 and Ser. Nos. 76/417,360, 76/417,361 and 76/417,362 as such

relate to hunting and hunting related products. Notwithstanding the foregoing, in the event this Agreement is terminated prior to the date of Licensor's death, Licensor and Licensor's Beneficiary shall cease to be bound by this Paragraph 13.

14.    (a)    Licensor shall not assign, pledge, hypothecate, mortgage or otherwise encumber his ownership of the Marks, without the consent of Licensee, which consent shall not be unreasonably withheld.

In the event Licensor receives a bona fide offer in writing (the "Offer") from any person, firm or corporation (the "Third Party") to purchase the Marks and/or the design or development of any Licensed Products that are so designed or developed by Licensor during the term of the Agreement , which Offer is acceptable to Licensor, then Licensor shall give notice of his desire to sell the Marks and/or Licensed Products and shall deliver a copy of the Offer to Licensee. Licensee shall have the right, but not the obligation, within ten business days after delivery of such Offer, to purchase the Marks and/or Licensed Products at the price and upon the terms set forth in the Offer. If the Marks and/or Licensed Products are not purchased by Licensee through the foregoing procedure, then the Marks and/or Licensed Products may be sold to the Third Party at the price and upon the terms set forth in the Offer; provided, however, if the actual purchase price or terms shall vary from those set forth in the Offer, then Licensee shall first have an opportunity to match said revised purchase price and terms and Licensor shall sell the Marks and/or Licensed Products on said revised purchase price and terms as heretofore provided.

Likewise, upon the eighth anniversary of Licensor's death, ownership of the Marks, as well as the applications and registrations thereof, shall transfer to Licensee without any further consideration provided Licensee is not in breach of this Agreement and so long as this Agreement is in effect. Licensor will execute the attached Assignment at the same time it executes this Agreement.

(b)    The representations, warranties, covenants, agreements and obligations of the parties hereto made in and pursuant to this Agreement shall survive the date hereof and any termination hereof.

(c)    This Agreement constitutes the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supercedes any and all prior agreements, whether written or oral, with respect to the subject matter hereof.

(d)    This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of Georgia, without regard to any conflicts of laws.

(e)    This Agreement shall be binding upon and inure to the benefit of Licensor and his personal representatives, heirs and assigns, and Licensee and its successors and permitted assigns. Except as provided in Paragraphs 1(c)and 11(a) hereof, the permission granted to Licensee to use the Marks herein is personal to Licensee and shall not be transferable, assignable or inure to the benefit of any successor or assignee of Licensee without the prior written consent of Licensor. If Licensee shall attempt or purport to assign or otherwise sell, transfer or encumber

9

this Agreement or its interest in the License or the Marks, or any interest in any of the foregoing, Licensor shall have the right to terminate this Agreement, subject to 30 days prior written notice to Licensee.

Upon the termination or cancellation of this Agreement, Licensee agrees to discontinue promptly all use of the Marks and any marks similar thereto, and Licensee further agrees that any and all rights to the use of the Marks as authorized by this Agreement shall, upon the termination or cancellation of the Agreement, revert to Licensor. Licensor acknowledges that Licensee's continued use of the Safariland name and the #69 Doe-In-Rut trademark in connection with the Marks during the term of this Agreement does not constitute any continued right to use same in any respect by Licensor upon the termination of this Agreement. Upon the termination of this Agreement, Licensor shall quitclaim, remise and release unto Licensee any right, title or interest he or his heirs or assigns might have or claim in the names Safariland and Safariland Hunting Corporation, and the #69 Doe-In-Rut trademark to Licensee.

(f)     Any notice, application, approval, consent, demand, requests or other communication between the parties hereto required or permitted hereunder shall be in writing and shall be sufficiently given if delivered in person, or mailed by certified mail, with return receipt requested and postage prepaid, addressed as follows or to such other address as either party hereto, shall notify the other party hereto:

(a)     If to Licensor, to:

Aubrey P. ("Tink") Nathan, Jr.
31059 M. Grantham Road
Bush, Louisiana 70431-4129

With a copy to:

Richard M. Kremen, Esquire
Semmes, Bowen & Semmes
250 West Pratt Street
Baltimore, Maryland 21201

(b)     If to Licensee, to:

PAT Acquisition LLC
c/o Frist Capital, LLC
Suite 500
3100 West End Avenue
Nashville, Tennessee 37203
Attention: Rawls Butler

With a copy to:

10

Bass Berry & Sims PLC
AmSouth Center
315 Deaderick Street
Suite 2700
Nashville Tennessee 37238-3001
Attention: Howard H. Lamar III, Esquire
        Paul W. Kruse, Esquire

Notices shall be deemed to have been delivered upon the earlier of actual receipt or six days after deposit in the United States mail.

(g)     No amendment, modification or waiver of any term or condition of this Agreement shall be valid or of any force or effect, unless made by written instrument  signed by the parties hereto, specifying the exact nature of such amendment, modification or waiver.  Any waiver by either party of any provision of this Agreement shall not imply a subsequent waiver of that or any other provision.

(h)     If any term or condition of this Agreement should be held invalid in any respect by a court, arbitrator or tribunal of competent jurisdiction, such invalidity shall not affect the  validity of any other term or condition hereof. If any term or condition of this Agreement should be held to be unreasonable as to time, scope or otherwise by such a court, arbitrator or tribunal, it shall be construed by limiting or reducing it to the minimum extent so as to be enforceable under then applicable law. The parties hereto acknowledge that they would have executed this Agreement with any such invalid term or condition excluded or with any such unreasonable term or condition so limited or reduced.

(i)     This Agreement may be executed in counterparts, each of which shall be deemed an original, and all of which when taken together shall constitute one and the same Agreement.

(j)     In any action between the parties to enforce any of the terms of this Agreement or any action pertaining to this Agreement, the prevailing party shall be entitled to recover expenses, including, without limitation, reasonable attorneys' fees, and expenses and costs of any appeals.

(k)     This Agreement ₋shall not constitute a joint venture or partnership between Licensor and Licensee.  Except as  otherwise provided herein, neither party shall have the power or authority to make any contract or commitment on behalf of the other.

(l)     Time is of the essence for the performance of each and every covenant and the satisfaction of each and every condition of this Agreement.

11

IN WITNESS WHEREOF, the parties here to have duly executed and delivered this Agreement as of the day and year first above written.

Witness:                                          Licensor:

_Dorothy Branthim_                                _Aubrey Nathan_
                                                  Aubrey P. Nathan, Jr.

Witness:                                          Licensee:

_Harold Sanders_

                                                  PAT Acquisition LLC

                                                  By:  _A. Nathan_

                                                  Title:  _Member_

(CORPORATE SEAL)

12

2442595.2

6: 03-09-6575

## TRADEMARK ASSIGNMENT    Sept 29, 2010

TRADEMARK ASSIGNMENT made as of January———, 2004 by and among Aubrey P. Nathan, Jr. with an address at 31059 M. Grantham Road, Bush, Louisiana 70431-4129 (the "Assignor") and PAT Acquisition LLC with an address at c/o Frist Capital, LLC, Suite 500, 3100 West End Avenue, Nashville, Tennessee 37203 (the "Assignee"). Assignee is a Limited Liability Company of Delaware.

Assignor owns all right, title and interest to certain trademark(s), the applications and/or registrations for which are set forth in SCHEDULE A (collectively, the "Trademark(s)"). Assignor wishes to assign all right, title and interest to the Trademark(s) to Assignee.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Assignor does hereby assign to Assignee, its successors, assigns and legal representatives, the entire, full and exclusive right, title and interest in and to the Trademark(s), together with the good will of the business symbolized by the Trademark(s) and any applications and/or registrations therefor, and the right (but not the obligation) to assert the Trademark(s) and to collect for all past, present and future infringements, and claims for damages and the proceeds thereof, including, without limitation, license royalties and proceeds of infringement suits and all rights corresponding thereto throughout the world by reason of any past and future acts of infringement that have occurred or may occur.

If any of the Trademark(s) are the subject of an application based on Assignor's bona fide intent to use the Trademark(s) in commerce, Assignor hereby represents that Assignee is the successor to the portion of Assignor's ongoing and existing business to which the application and the Trademark(s) pertain.

Assignor and Assignee have entered into an AMENDED AND RESTATED LICENSE AND ROYALTY AGREEMENT of even date herewith. Upon the eighth anniversary of Assignor's death, this assignment shall become effective provided Assignee is not in breach of the aforementioned license agreement and so long as the aforementioned license agreement is in effect.

Aubrey P. Nathan, Jr.

By:

PAT Acquisition LLC

By:

Name: A. RAWLS BUTLER

Title: MANAGER

R.8-27-10

JAN.15.2004   5:15PM    BASS, BERRY & SIMS                        NO.400   P.38/38

## SCHEDULE A

### Mark(s)

| | |
|---|---|
| TINK'S (Stylized) | Reg. No. 1,207,374 |
| TINK'S TOTAL PROTECTION | Reg. No. 1,456,049 |
| TINK'S | Ser. No. 76/417,360 |
| TINK'S | Ser. No. 76/417,361 |
| TINK'S TOTAL PROTECTION | Ser. No. 76/417,362 |

2442636.1

6: 03-09-6575

JAN. 15. 2004   5:15PM   BASS, BERRY & SIMS                    NO. 400   P. 37/38

## TRADEMARK ASSIGNMENT  Sept 29, 2010

TRADEMARK ASSIGNMENT made as of January——, 2004 by and among Aubrey P. Nathan, Jr. with an address at 31059 M. Grantham Road, Bush, Louisiana 70431-4129 (the "Assignor") and PAT Acquisition LLC with an address at c/o Frist Capital, LLC, Suite 300, 3100 West End Avenue, Nashville, Tennessee 37203 (the "Assignee"). Assignee is a Limited Liability Company of Delaware.

Assignor owns all right, title and interest to certain trademark(s), the applications and/or registrations for which are set forth in SCHEDULE A (collectively, the "Trademark(s)"). Assignor wishes to assign all right, title and interest to the Trademark(s) to Assignee.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Assignor does hereby assign to Assignee, its successors, assigns and legal representatives, the entire, full and exclusive right, title and interest in and to the Trademark(s), together with the good will of the business symbolized by the Trademark(s) and any applications and/or registrations therefor, and the right (but not the obligation) to assert the Trademark(s) and to collect for all past, present and future infringements, and claims for damages and the proceeds thereof, including, without limitation, license royalties and proceeds of infringement suits and all rights corresponding thereto throughout the world by reason of any past and future acts of infringement that have occurred or may occur.

If any of the Trademark(s) are the subject of an application based on Assignor's bona fide intent to use the Trademark(s) in commerce, Assignor hereby represents that Assignee is the successor to the portion of Assignor's ongoing and existing business to which the application and the Trademark(s) pertain.

Assignor and Assignee have entered into an AMENDED AND RESTATED LICENSE AND ROYALTY AGREEMENT of even date herewith. Upon the eighth anniversary of Assignor's death, this assignment shall become effective provided Assignee is not in breach of the aforementioned license agreement and so long as the aforementioned license agreement is in effect.

Aubrey P. Nathan, Jr.

By: _____

PAT Acquisition LLC

By: _____

Name: A. Rawls Butler

Title: Member

R.8-27-10

JAN.15.2004  5:15PM    BASS, BERRY & SIMS              NO.408   P.38/38

## SCHEDULE A

### Mark(s)

| | |
|---|---|
| TINK'S (Stylized) | Reg. No. 1,207,374 |
| TINK'S TOTAL PROTECTION | Reg. No. 1,456,049 |
| TINK'S | Ser. No. 76/417,360 |
| TINK'S | Ser. No. 76/417,361 |
| TINK'S TOTAL PROTECTION | Ser. No. 76/417,362 |

2442636.1